**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division


ANGELA DENISE COVIL,

Plaintiff,

v.                                                    ACTION NO. 2:14cv104

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.


**UNITED STATES MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION**

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated June 3, 2014.  ECF No. 5.  This Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 10) be DENIED, the decision of the Commissioner be VACATED and the case be REMANDED for further administrative proceedings.

# I. **PROCEDURAL BACKGROUND**

The plaintiff, Angela Denise Covil ("Plaintiff" or "Covil"), filed applications for SSI and DIB on January 13, 2011, alleging she had been disabled since July 26, 2010. R. 14, 133-36, 202.[1] The application stemmed from degenerative disc disease—sustained during an injury as a street utility worker—and arthritis of her right knee. R. 28.

The Commissioner denied Plaintiff's application on June 2, 2011, and upon reconsideration on August 9, 2011. R. 14, 71, 73-90, 97-103. At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on October 11, 2012 where both the Plaintiff (who was represented by counsel) and an impartial vocational expert (VE) testified. R. R. 25-61, 104-05. The ALJ released an opinion on November 6, 2012, finding Plaintiff not disabled and denying Plaintiff's claim. R. 14-21.

Plaintiff requested review of the ALJ's decision by the Appeals Council, and on January 14, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. R. 1-10. The ALJ's decision therefore stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

Having exhausted all administrative remedies, Plaintiff filed a complaint with this Court on March 12, 2014 (ECF No. 1), and Defendant answered on May 30, 2014 (ECF No. 3). On June 5, 2014, an order was entered directing the parties to file motions for summary judgment. ECF No. 16. Plaintiff's Motion for Summary Judgment and Memorandum in Support were submitted on July 7, 2014. ECF Nos. 8 & 9. Defendant Commissioner's Motion for Summary Judgment and Memorandum in Support were filed on August 6, 2014. ECF Nos. 10 & 11. Plaintiff's Rebuttal Brief was filed on August 21, 2014. ECF No. 12. As neither counsel in this

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1961 and was forty-eight years old at the date of the alleged disability, July 26, 2010. R. 133. Plaintiff graduated high school, and has worked as a bus driver, truck driver, a street utility worker, and a janitor. R. 28.

### A. Plaintiff's Medical History

Plaintiff's relevant medical history begins with a visit to Patient First on July 26, 2010. R. 280. She reported that she pulled her back while lifting rails at work—she complained of right lateral thoracic and lower lumbar pain. R. 280.  An x-ray of Plaintiff's lumbosacral spine showed narrowing of the L5-S1 disc space and degenerative spur formation at L2-L3, L3-L4, and L5-S1, without fracture or subluxation, and pedicles preserved. R. 280. Dr. C. Wayne Lankford diagnosed Plaintiff with a thoracic sprain and a lumbar sprain. R. 280. He prescribed Vicodin, Flexoril and Indocin for relief of pain and muscle spasm, and restricted Plaintiff to light duty work—no heavy lifting and no stooping or bending—for July 29, 2010, with a full-duty release date of July 30, 2010. R. 281.

On July 29, 2010, Plaintiff returned to Patient First. R. 282, complaining of pain along her right side and in her hip, and of not being able to return to regular duty. R. 282. Dr. Mark J. Hippenstiel diagnosed her with musculoskeletal pain and limited her to light-duty work—no bending, no lifting more than five pounds, and no standing for more than ten minutes each hour until cleared by an orthopedist—beginning July 30, 2010. R. 282. Dr. Hippenstiel increased Plaintiff's medication to Darvocet for pain, prescribed a Medrol Dosepack, and referred her to the Spine Center at Chesapeake ("The Spine Center") for her musculoskeletal pain. R. 282.

On August 3, 2010, Plaintiff went to The Spine Center for an evaluation by Deniz O. Goss, PA-C, a physician's assistant. R. 298-99. Her symptoms included low back, right buttock, and thigh pain, with right lower extremity discomfort. Plaintiff reported weakness in her right hip, but did not have numbness or tingling in her legs, and her thoracic back pain had resolved. R. 298. Plaintiff stated that the Medrol Dosepak and Darvocet did little to alleviate her pain, and that while the pain was worse with standing and walking, it was minimally alleviated with bedrest and sitting. R. 298. Examination of the Plaintiff's spine showed no obvious curvatures or deformities, but she did have "exquisite tenderness to palpation along the midline at the L4-S1 level, as well as in the paraspinal musculature bilaterally." R. 299. Ms. Goss was unable to evaluate Plaintiff's deep tendon reflexes due to Plaintiff's discomfort and guarding. R. 298-99. Ms. Goss stated that the x-rays of Plaintiff's spine were notable for the loss of disc height at L4-L5 and L5-S1, and there was multi-level spondylosis present anteriorly. R. 299. She also stated that the films of Plaintiff's thoracic spine were notable for multi-level spur formation, but otherwise unremarkable. R. 299. Ms. Goss recommended a formal course of physical therapy and that Plaintiff remain on a no-duty status until her appointment on August 31, 2010. R. 299. David G. Goss, M.D., agreed with this plan. R. 299.

Plaintiff returned to The Spine Center on August 31, 2010. R. 297. She had attended several physical therapy sessions, but reported that she was "absolutely no better" from them, that the muscles in the back were getting weak, and that she had to use the riding cart at the grocery store. R. 297. She was not in acute distress, was able to alternate between sitting and standing with minimal effort, and her gait was normal. R. 297. With Dr. Goss's agreement, Ms. Goss sent Plaintiff for an MRI. R. 297.

On September 3, 2010, the MRI of Plaintiff's lumbar spine was taken and revealed: mild disc bulge and mild facet degenerative change at L2-L3; moderate right foraminal stenosis at L3-L4 due to mild disc bulge with superimposed right foraminal disc protrusion; diffuse disc bulge with severe bilateral facet degenerative change and mild bilateral foraminal stenosis at L4-5; diffuse disc bulge with central annular fissure, superimposed central disc protrusion, and moderate bilateral facet degenerative change and mild bilateral foraminal stenosis at L5-S1. R. 279. There was no evidence of high-grade spinal canal stenosis at any level. R. 279.

On September 14, 2010, Plaintiff returned to The Spine Center, and was diagnosed with herniated lumbar disc and lumbar spondylosis. R. 296. With Dr. Goss's agreement, Ms. Goss scheduled Plaintiff for epidural steroid injections, to attempt to alleviate her symptoms. R. 296.

These injections were performed by Dr. Richard D. Guinand at The Spine Center on September 20 and October 11, 2010. R. 294-95. Before the October 11 injection, Plaintiff reported that she had not received any relief from the September 20 injection. R. 294.

On October 28, 2010, Plaintiff returned to The Spine Center to see Physician's Assistant Goss. R. 293. She stated that the injections provided no relief, and presented with the same symptoms as before—low back and right lower extremity pain. R. 293. Ms. Goss stated that Plaintiff was

> extremely frustrated and actually tearful throughout our interview today. She is really wanting to get back to work but is currently in no condition to be able to do so. She states that at this point she is taking Indocin twice a day, Vicodin twice a day, and her muscle relaxer three times a day. These do take the edge off for her and help her get through the day but she is likewise frustrated with all the medication that she has to take.

R. 293.

On December 1, 2010, Plaintiff had her initial appointment with Dr. Pennington, who changed her medications slightly. R. 291.

On December 9, 2010, Plaintiff came to The Spine Center with her workers' compensation case manager. R. 291. She reported that her right leg pain had gotten worse, and reported that she had starting walking with a cane for the past month, out of fear of her leg giving out. R. 291. Plaintiff demonstrated an antalgic gait favoring her right leg. R. 291. Ms. Goss felt that because the leg pain was growing worse, and Plaintiff was essentially unable to exercise, it would be better to proceed with an L3-4 decompression and diskectomy to free up the right-sided nerve root, in an attempt to decrease the pain in the right leg. R. 291

On January 27, 2011, Plaintiff returned to The Spine Center, and was examined by Dr. Goss. R. 290. At this point, after six months of ineffective non-surgical treatment, he concluded that Plaintiff was in debilitating pain, and surgical management was appropriate. R. 290. Dr. Goss recommended a facetectomy on the right at L3-4, radical decompression of the right L3 nerve root with discectomy, combined with a posterior fusion at L3-4, only utilizing pedicle screws and an interbody cage at the L3-4 level. R. 290. He also determined that Plaintiff could remain out of work, and put her on a no-duty status. R. 290.

Following Dr. Goss's referral, Plaintiff went to see Beth M. Winke, M.D., a pain management doctor, on February 14, 2011. R. 435-37. Plaintiff told Dr. Winke that she had low back pain that radiated to her legs, and that her symptoms were constant and increased with activity. Initially her pain level was a ten, and during the examination, it dropped to nine. R. 435-36. She used a cane when walking, and could only bend forward half the normal range. R. 436.

Plaintiff had surgery on February 23, 2011. R. 286-288; 264-265. Pre-surgery imaging confirmed lumbar stenosis and a disc herniation at L3-L4. R. 264. Dr. Goss performed a lumbar laminectomy, decompression, discectomy and posterior spinal fusion on Plaintiff at L3-L4. R. 261, 264-65, 286.

On March 24, 2011, Plaintiff returned to Dr. Goss for a follow-up doing "reasonably well," was neurologically intact, and her incision was benign. R. 285. Dr. Goss ordered four to six weeks of post-surgical physical therapy and kept her out of work. R. 285.

On March 25, 2011, Plaintiff went to a pain management appointment with Dr. Winke's Physician's Assistant. R. 433. She reported a twenty percent decrease in back pain but stated that she still had residual leg pain. R. 433.

On April 22, 2011, Plaintiff had another pain management appointment with Dr. Winke's office. R. 431-32. She walked with a cane and antalgic gait, but no limp. R. 431. Her lumbar spine was not tender, and she maintained normal range of motion. R. 431-32.

On April 28, 2011, Plaintiff saw Dr. Goss. R. 284. Dr. Goss recorded that she was "doing well" and that she was "pleased with her progress." R. 284. There was no change in her physical examination, and he directed Plaintiff to complete physical therapy and return to him in one month—at which point he stated he would likely release her to light-duty work restrictions. R. 284.

On May 20, 2011, Plaintiff returned to Dr. Goss's office and was assessed with lumbar postlaminectomy syndrome with neuralgia, neuritis and radiculitis. R. 424-26. Plaintiff walked with a cane and antalgic gait, but no limp, and Dr. Goss requested that Plaintiff be weaned off her pain medication and work towards getting off her cane. R. 424. Plaintiff exhibited tenderness of the transverse process on the right and left at L4, tenderness of the sacroiliac joint, tenderness of the piriformis, and decreased sensation at L4 and L5. R. 425-26. She also showed diminished reflexes in both ankles and both knees. R. 426.

On May 26, 2011, Dr. Goss noted that Plaintiff continued to progress slowly, was having some axial back pain, which was appropriate, and AP and lateral views of the lumbar spine

confirmed no interval changes. R. 320. There had been slight posterior migration of the interbody cage, but no malalignment elsewhere. R. 320. He permitted Ms. Covil to return to work, but imposed light duty restrictions on her—that she lift no greater than ten pounds, and engage in sedentary work activity no more than six hours per day. R. 320.

On June 2, 2011, a state agency physician, Robert Castle, M.D., reviewed Plaintiff's medical records. R. 67-71. Based primarily on her activities of daily living, precipitating and aggravating factors, treatment other than medication, and expectation of recovery, he determined that she retained the physical residual functional capacity to perform a modified range of light work. R. 67-69. Dr. Castle stated that Plaintiff experienced "significant limitations, however, with recent surgery her condition would be expected to improve within 12 months of onset." R. 67. In the "Personalized Decision notice" as to whether she was disabled, Dr. Castle stated,

> [w]hile your condition currently results in limitations, your condition is improving and not expected to be disabling for a continuous period of 12 months. Though your condition is currently severe, it is expected to improve. While you will not be able to perform work you have done in the past, it is expected that you will be able to perform work that is less demanding. We have determined that your condition is not expected to remain severe enough for 12 months in a row to keep you from working.

R. 71.

On June 17, 2011, Plaintiff had a management appointment with Dr. Winke's office. R. 421-22. Plaintiff reported that she had been trying to wean herself off her cane, but she had problems walking distances. R. 421. Dr.Winke described Plaintiff as slowly improving. R. 422. An examination showed tenderness of the transverse process on the right at L4 and the transverse process on the left at L4, tenderness of the SI joint, and tenderness of the piriformis muscle in the hip. R. 422. Dr. Winke continued Plaintiff's Percocet taper and added a Flector patch to the

medication protocol. R. 423. She planned to decrease Plaintiff's Percocet—in order to switch her pain medicine to hydrocodone—and increase the Lyrica, if needed. R. 423.

Both parties agree that results from pain management appointments on July 15, 2011 (R. 416-19), August 15, 2011 (R. 412-16), September 10, 2011 (R. 408-11), and October 8, 2011 (R. 404-08) were essentially the same as those from June 17, 2011. ECF No. 9 at 11; ECF No. 11 at 8. Notable specifics include that at the August 15, 2011 appointment, Plaintiff said she was doing okay, but reported that she had burning low back pain over the area of her surgical incision; she had been walking for exercise, trying not to use her cane, and stopped smoking. R. 413-14. At her October 8 appointment, Plaintiff reported going back to work on light duty, but had back and leg pain, and had to change positions frequently. R. 406.

Plaintiff visited Dr. Goss's office on July 13, 2011, and he also noted that there was no change in her physical examination since his last examination. R. 319. He continued her light duty restrictions—no lifting greater that ten pounds, limited walking, standing, stooping, kneeling and climbing—and directed her toward office work only, with no riding or driving in trucks. R. 319.

On August 8, 2011, another state agency physician, Martin Cader, M.D., reviewed Plaintiff's medical records. R. 78-81. Dr. Cader also determined that Plaintiff was capable of performing a modified range of light work. R. 78-83. Just like Dr. Castle, he said that Plaintiff "experiences significant limitations, however, with recent surgery her condition would be expected to improve within 12 months of onset." R. 78. Here, now twelve months after the alleged onset date, Dr. Cader stated that "with recent surgery her condition would be expected to improve within 12 months of onset." R. 78. Again, in a remarkably un-individualized

"personalized decision notice," Dr. Cader gave the same assessment, at places word for word,

that Dr. Castle had given two months before:

> [t]hough your condition is currently severe, it is expected to improve. While you
> will not be able to perform work you have done in the past, it is expected that you
> will be able to perform work that is less demanding. We have determined that
> your condition is not expected to remain severe enough for 12 months in a row to
> keep you from working.

R. 83; *cf.* R. 71.

On August 25, 2011, Plaintiff came to the Spine Center with her Nurse Care Manager. R.

317. Dr. Goss noted that Plaintiff had lost some weight, stopped smoking, and her pain levels

"have apparently decreased as her activity levels have been increasing and Dr. Winke has

decreased her use of narcotics." R. 317. Dr. Goss continued Plaintiff on light-duty status. R. 317.

On October 3, 2011, Dr. Goss filled out a job slip that allowed Plaintiff to return to

sedentary duty—no lifting greater than ten pounds. R. 316. He also noted that Plaintiff could use

a cane while working and could not operate heavy machinery. R. 316.

On October 14, 2011, Plaintiff was in a car accident and went to Chesapeake General

Hospital. R. 358-60.  Plaintiff was in ten out of ten pain, and needed "extensive imaging." R.

355. She was diagnosed with cervical strain and lumbar pain, but released in a stable condition.

R. 356.

On October 21, 2011, Dr. Goss noted that Plaintiff was attempting light duty (sedentary)

work, and doing well with computer and filing type work—daily for the past two-to-three weeks.

R. 314. Plaintiff still had pain, but was tolerating it with pain management and aqua therapy. R.

314. Dr. Goss did not anticipate any dramatic changes concerning Plaintiff's work status in the

next few months, and made no comment about the car accident. R. 314

On November 2, 2011, Plaintiff was seen at The Spine Center by Physician's Assistant Timothy Winkler, and noted additional pain from her car accident. R. 312-13. She had normal posture and gait, and a normal cervical range of motion. R. 312.

On November 8, 2011, Plaintiff came to Dr. Winke's office and reported inadequate pain control, and that she could not walk long distances without having to sit down due to pain. R. 403. Plaintiff had returned to work full-time, restricted to light duty, but the medications had a sedating effect, so Plaintiff could not take them during the day, and was feeling very frustrated. R. 403. Physician's Assistant Serrano noted that a walker with wheels might help Plaintiff's mobility. R. 403.

Ms. Covil's condition remained largely unchanged at her monthly follow-up visits with Dr. Winke on December 9, 2011 (R. 396-99), January 9, 2012 (R. 392-95), and February 10, 2012 (R. 388-91). The only notable differences are that on February 10, 2010, Dr. Winke recorded that she would no longer prescribe narcotics for Plaintiff. R. 391.

On December 5, 2011, Plaintiff told Dr. Goss that her car accident had worsened her pain. R. 310. She stated that her physical therapy was coming along slowly, but her condition was improving with it. R. 310. The physical therapist had told her that she would need two more weeks of physical therapy. R. 310. Plaintiff's gait was normal. R. 310.

On February 3, 2012, Plaintiff saw Dr. Goss for the last recorded time. R. 307-09. He reported that her gait, muscle tone, and muscle strength were normal, and an x-ray of her lumbar spine showed normal post-operative changes. R. 308. He ordered an x-ray, and noted, "CT imaging of the lumbar spine will be obtained, primarily to rule out occult lesions, and to assess her fusion at L3/4. In addition, FCE testing will be obtained." Dr. Goss noted that he would

assign permanent restriction, if appropriate, after the results of these tests. R. 309. Dr. Goss intended to determine her maximum medical improvement at that time.

On February 22, 2012, Plaintiff was admitted to the Emergency Department of Chesapeake General Hospital with vomiting, diarrhea, abdominal cramping, and chest pain. R. 331-40. A CT Scan was normal, showing her lumbar surgery. R. 331-52. She was released home in stable condition, diagnosed with only diarrhea instructions. R. 332

Plaintiff visited Dr. Winke's office on March 26 and May 21, 2012, and reported symptoms largely similar to those from January 9 and February 10, 2012. R. 380-83, 384-87. Of note, on March 26, 2012, Dr. Winke recorded that she could not complete the FCE due to blood pressure issues, and Plaintiff repeated that Dr. Goss had ordered a CT scan. R. 386-87. Also, on May 21, Plaintiff asked about stronger pain medication, but Dr. Winke said she was unable to prescribe any, and recommended an epidural steroid injection. R. 383.

On May 29, 2012, Dr. Winke began a series of three fluoroscopically-guided epidural injections to relieve Plaintiff's back pain. R. 377-79. A second procedure was performed at Dr. Winke's office on June 19, 2012. R. 374-376. Dr. Winke also performed a third injection on July 3, 2012. R. 371-73. On July 16, 2012, Plaintiff reported some relief from these injections, noting some 'shifting' of the pain in the right lumbar region. R. 367-69.

On June 8, 2012, Dr. Winke noted in a Virginia Retirement System Physician's Report that Plaintiff had chronic low back pain, radiating to both legs, her pain was at a ten out of ten, and her symptoms increase with all activity, staying constant throughout the day. R. 361. She reported that Plaintiff had been unable to work since her first visit on February 14, 2011, and that she was permanently disabled from performing her usual work duties. R. 361-62.

The last visit in the record was to Dr. Winke's office on September 10, 2012. R. 365-66. Physician's Assistant Serrano reported results essentially the same as those from May, 2011. R. 365-66, 427-28).

On September 28, 2012, Dr. Winke filled out a Medical Evaluation Report indicating that Plaintiff was generally disabled. R. 438-40. She noted that Plaintiff could sit for one hour and stand/walk for one hour in an eight-hour day. R. 439. She could not lift more than five pounds, and was totally restricted from all environmental conditions. R. 439. Dr. Winke opined that Plaintiff's pain would have a daily effect on her concentration, memory, focus, and ability to stay on task in a work setting. R. 438.

According to Dr. Winke, Plaintiff would need to take extra rest breaks causing her to be off task for over one hour in an eight-hour workday; required bed rest such that she could be expected to not report to work four or five days per month; she could not work full time at any level of exertion; could sit for only one hour and stand/walk for one hour in an eight-hour workday; could occasionally lift up to five pounds but never lift anything heavier; could not use her feet for repetitive movements; and had to totally avoid certain environmental conditions—unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. R. 438-40. Dr. Winke expected such limitations to last more than twelve months, with an unknown prognosis for recovery of function. R. 440.

**B. Plaintiff's Non-Medical History**

On March 3, 2011, Plaintiff filled out an Adult Function Report. R. 194-201. Plaintiff reported that she: had two dogs, but needed assistance caring for them; needed help with her personal care such as bathing or dressing, but did not need special reminders to take her

medicine; could not prepare her own meals; did not do house or yard work; did not drive; and only went outside for appointments. R. 195-97. Plaintiff reported that she shopped in stores once a week; could handle money; enjoyed reading, watching television, and talking on the phone; went to church; and did not need to be reminded to go places. R. 195-98.

### C. Testimony Before the ALJ

Plaintiff testified that after her surgery, she was out of work from February 22, 2011, to October 4, 2011. R. 34. She returned to her prior employer, the City of Chesapeake, and performed what she called "light-duty" work from October 4, 2011, to May 10, 2012. R. 30, 32, 34-39. This included filing papers and answering phones, and other "makeshift" duties. R. 41-42. Plaintiff's employment was effectively terminated on August 7, 2012, because they did not have any more light duty work for her to do. R. 36, 54. Plaintiff stated that she had been looking for work but was unable to find any because of her wrist and need for a cane. R. 54.

Plaintiff further testified that she could not keep her balance well, and needed to use a motorized cart at the grocery store. R. 44. Although she tried to reduce reliance on her cane, she needed it to keep her balance. R. 55. Plaintiff stated that she could not stand or walk for very long—needing a break perhaps every ten to fifteen minutes. R. 45. When exercising, she walked about one lap around a quarter-mile track. R. 50-51.

Plaintiff said that she needed to adjust positions while sitting, that her daughters aided her with most of her chores, shopping, and driving, and that she could lift ten to twenty pounds. R. 46. Plaintiff testified that she was in pain all of the time, and had to lie down four to five times a day for pain relief. R. 47-48.

At the hearing, a vocational expert ("VE") described Plaintiff's past relevant work over the past fifteen years, and identified the skill and exertional level of the work. R. 59-60. The VE

testified that Plaintiff's work as a highway cleaner was medium, unskilled work, that she had done other cleaner jobs that were light, unskilled work, and that she'd been a janitor, which was medium, unskilled work. R. 60. Her work as a school bus driver was medium, semi-skilled, as was her work as a truck driver. R. 60. The clerical worker position she did with the city was sedentary, semi-skilled. R. 60.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper

standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file applications for DIB and SSI, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that

prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

### A. ALJ's Decision

On November 6, 2012, following the administrative hearing, the ALJ made the following findings with respect to Plaintiff. R. 14-21.

At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 26, 2010, the alleged onset date of her disability. He found that Plaintiff had continued to operate a cleaning business after she was disabled, but that her earnings were not enough to constitute substantial gainful activity. R. 16. The ALJ also noted that Plaintiff did not work from the date of her injury, July 26, 2010 until October 4, 2011, but at that point returned to work in a light duty capacity—filing papers, inputting work orders into a computer, answering telephones). R. 16. She worked in this lighter capacity until May 2012, and made over $11,000 in that time period, after which she was sent home because there was no more work for her to perform. R. 16. The ALJ stated that:

> [b]ecause of the length of time the [Plaintiff] worked between October 4, 2011 and May 10, 2012, this activity cannot be considered an unsuccessful work attempt. . . . [T]he evidence does not tend to reflect that the claimant's work during the applicable period was not substantial, and the undersigned notes that

work at a lesser level of responsibility, activity, or pay than done previously may still be "substantial." Moreover, the work was clearly performed at SGA level, in terms of her earnings. However, because the resolution of this issue will not alter the outcome of this decision, the undersigned will reserve the determination of whether the claimant's work . . . between October 2011 and May 2012 constituted substantial gainful activity.

R. 16-17.

At step two, the ALJ found the following severe impairments: degenerative disc disease, left knee meniscus tear, and obesity. R. 17.

At step three the ALJ found that Plaintiff's condition did not meet the criteria of any of the listed impairments in 20 C.F.R. 404.1520(d), 404.1525, or 404.1526. R. 17. Although severe, Plaintiff's degenerative disc disease and left knee meniscus tear did not meet the specific clinical signs and diagnostic findings requirements in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. Part 404. R. 17. Obesity is not specifically included in the Listing of Impairments, and Plaintiff's obesity did not, by itself or in conjunction with her other impairments, meet any of the entries in the Listing of Impairments. R. 17.

Next, the ALJ determined that Plaintiff had the RFC to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). R. 18. In reaching his determination, the ALJ considered Plaintiff's symptoms and the extent to which they could reasonably be accepted compared to the objective medical evidence, and reviewed the relevant medical opinions.[2]

The ALJ observed Plaintiff's testimony that she had difficulty walking, had to use a motorized cart while shopping, loses her balance and cannot stand, and that her family members

---

[2] The ALJ and Defendant make scattered references to the Plaintiff's pre-surgery condition, whenever there is a record of Plaintiff walking with a normal gait. These data points are somewhat less compelling because, despite their occurrence, her treating physician still recommended that she have surgery, and she did. In some ways, the fact that she sometimes could walk normally, yet still required surgery, undermines Defendant's position that a periodically normal gait proves a lack of disability now.

assist her with her cleaning, shopping, and bathing. R. 18. She has pain in her back, legs, and hips. R. 18. Her medication helped sometimes, but she was always in pain, she lay down four to five times per day, for about 30 minutes at a time, and had been seeing a pain management specialist. R. 18. She also testified that she only walked about one lap at a track, used pain patches daily—which eased, but did not remove her pain—could not balance without her cane, and feared falling. R. 18.

The ALJ also noted, however, that Plaintiff could dust, walk for ten to fifteen minutes, drive, and sometimes shop. R. 18. She could lift ten to twenty pounds, she went to church and socialized with her family, and her pain management doctor gave her steroid injections, which provided her a little relief. R. 18.

From this analysis, the ALJ found that while Plaintiff's medically detrimental impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible. R. 18.

In reviewing the medical evidence, the ALJ observed that Plaintiff did not pursue surgery for her meniscus tear, and did not did not have significant treatment for the knee since the alleged onset date. R. 19. Regarding her back injury from July 26, 2010, he noted that when she was first seen at The Spine Center, her symptoms included muscle spasms, tenderness, and positive straight leg raise test. R. 19. He pointed out, however, that on her August 31, 2010 visit, she was "able to alternate between sitting and standing with minimal effort, her gait was slow, but normal, she had full range of motion in her extremities, and she had reasonable strength in all muscle groups." R. 19. The ALJ considered that Plaintiff was neurologically intact and doing reasonably well after her surgery, and was released to light duty in May 2011 with instructions to

continue conservative treatment. R. 19. Plaintiff improved with physical therapy by December 2011, and on February 3, 2012, she was recorded to have a normal gait, grossly normal tone and muscle strength, normal range of motion of all major muscle groups, and normal sensation. R. 19. The ALJ also noted that the CT scans of October 2011 and February 2012 showed incidental findings of degenerative disc disease at L5-S1. R. 19.

The ALJ also considered the medical evidence from Plaintiff's visits to her pain management physician, Dr. Winke, since February 2011. R. 19. He noted that Dr. Winke's post-surgery examinations "consistently show[ed] antalgic gait, tenderness in her lumbar spine and hips, limited range of motion, diminished reflexes in the ankles and knees, and decreased sensation L4 and L5." R. 19.  He pointed out that Dr. Winke's treatment included both injections and medication, she had stopped prescribing narcotics, and that both her medical source statements for the Plaintiff indicated generally that Plaintiff was disabled. R. 19.  He considered that the latter of the two reports indicated that Plaintiff could sit for one hour and stand/walk for one hour in an eight-hour day, could not lift more than five pounds, and was totally restricted from all environmental conditions. R. 19.

The ALJ found Plaintiff's statements about symptoms and limitations to be only partially credible, "largely due to the objective medical evidence and her treatment history." R. 19. He found this in regard to her knee, because she had not had significant treatment for her left knee impairment since the alleged onset date, nor was there any significant objective findings relating to such impairment. As for her back, the ALJ found Dr. Winke's objective findings of tenderness, limited range of motion, and decreased sensation to conflict with Dr. Goss' notes that, following surgery, Plaintiff's "condition generally improved, such that by February 2012, she exhibited normal gait, tone, muscle strength, range of motion, and sensation." R. 19. The

ALJ further pointed out that prior to her surgery, an examination by Dr. Goss's office revealed Plaintiff to be generally normal, with normal gait, full strength, and full extremity range of motion. R. 20.

The ALJ also found Plaintiff's statements to be only partially credible because, while she continued to complain of significant pain, her doctors stopped treating her with narcotics. R. 20.[3] Dr. Winke noted Plaintiff had an antalgic gait and used a cane, but the ALJ noted that Plaintiff was not using a cane the day she appeared for a hearing. R. 20. Further, the ALJ stated that Plaintiff's complaints of disabling symptoms and limitations conflict with her daily activities of cleaning, shopping, driving, socializing, and claims that she coulc lift 10 to 20 pounds. R. 20. The ALJ found Plaintiff's credibility further undermined by the fact that she had worked from October 2011 to May 2012, which was said to have ended based on a lack of additional work, rather than due to Plaintiff's inability to sustain the activity. R. 20.

As for opinion evidence, the ALJ assigned little weight to the opinion of Dr. Winke. R. 20. The ALJ stated that her opinions were "extreme in nature, when considered in connection with the claimant's treatment notes from Dr. Goss, which show both subjective and objective improvement in her condition following her surgery." R. 20. He also considered her opinion inconsistent with Plaintiff's work history, which showed work from October 2011 to May 2012, with no apparent problems. R. 20.

The ALJ also gave little weight to the opinion of Dr. Goss. R. 20. The ALJ noted that Dr. Goss and his office placed various restrictions on Plaintiff, from "no duty" status from January 2011 to May 2011, then on light/sedentary duty, with specific limitations against walking, standing, stooping, kneeling, and climbing in July 2011. R. 20. Dr. Goss's office also stated she

---

[3] At one point Dr. Winke makes it sound like she has no choice, "I reminded her that I cannot prescribe [stronger medication] for her as it did not show up in her UDT." R. 383

could use a cane on October 3, 2011, and continued her on "light duty" on December 5, 2011. R. 20. The ALJ pointed out that such restrictions were "otherwise inconsistent with the objective findings . . . which show that the [Plaintiff's] physical exam was often benign even before surgery, and that her condition improved quickly after surgery, to the extent that her physical examination was generally normal by February 2010." R. 20.

The ALJ also gave little weight to the restrictions from Patient First from July 2010, because they were short-term in nature, and "superseded by the subsequent medical evidence from Dr. Goss, showing benign physical findings before surgery, and significant improvement in the [Plaintiff's] condition after surgery." R. 20.

Finally, the ALJ gave moderate weight to the opinions of the non-examining state agency medical consultants. R. 20. He stated that although their "placement of the [Plaintiff] at the light level of exertion is generally consistent with the record, the treatment notes from Dr. Goss, showing somewhat benign physical examinations of the claimant both before and during surgery, support a full light assessment here, with no additional postural or manipulative restrictions." R. 20-21.

From all of this, the ALJ found Plaintiff capable of performing the full range of light work as defined in 20 C.F.R. § 404.1567(b). R. 21.

At step four of the sequential analysis, the ALJ found that Plaintiff was capable of performing past relevant work as a cleaner. R. 21. He stated that Plaintiff "has past relevant work as a cleaner. The [Plaintiff] performed this position at substantial gainful activity level (at Colonnas Shipyard) . . . [t]he aforementioned position is performed at the light unskilled level, per the testimony of the vocational expert, Edith J. Edwards." R. 21. He found, accordingly, that Plaintiff was able to return to that position. R. 21.

**B. Plaintiff Assignments of Error**

In her memorandum in support of summary judgment, Plaintiff alleged that the ALJ erred in finding Plaintiff could return to her past physical labor doing janitorial work. She argues that:

(1) The ALJ failed to engage in a proper weighing of the evidence of record, making findings with respect to the claimant's residual functional capacity that particularly disregarded the evidence of the plaintiff's treating physicians but also disregarded all other medical evidence of record;

(2) In determining that Ms. Covil could return to past relevant work, the ALJ relied on vocational expert testimony that improperly classified past work at an exertional level that is inconsistent with the Dictionary of Occupational Titles without supporting that conflicting opinion.

### 1. Treating Physician Rule

The ALJ assigned minimal weight to Dr. Goss and Dr. Winke's opinions, while assigning moderate weight to the State agency medical consultants. R. 20-21. Plaintiff asserts the ALJ failed to apply the appropriate legal standards when weighing the medical opinion evidence and failed to weigh Dr. Goss and Dr. Winke's opinions under the factors in 20 C.F.R. § 404.1527. ECF No. 9 at 19.

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a) and § 416.945(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at § 404.1545(a)(1) and § 416.945(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work. *Id.* at § 404.1545(a)(5) and § 416.945(a)(5). The determination of RFC is based on a consideration of

all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3) and § 416.945(a)(3).[4]

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians. Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2), *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996).

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are: (1) examining relationship, giving more weight to sources who have examined a Platiniff; (2) treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based on the amount of evidence presented in support of the

---

[4] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a) and § 416.929(a).

opinion; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527(c) and § 416.927(c); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.").

Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(e)(2)(ii) and § 416.927(e)(2)(ii). Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 61 Fed. Reg. 34490, 34492 (July 2, 1996).  This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

### (a) Dr. Winke

Plaintiff argues that the ALJ's labeling of Dr. Winke's opinions as "extreme" was "a

conclusory disagreement without analytical support." ECF No. 9 at 20. She claims that discrediting Dr. Winke based on the work done from October 2011 to May 2012 is problematic, because the ALJ at step one did not consider her work to rise to the level of substantial gainful activity. ECF No. 9 at 20.[5] Finally, it is clear from the record that Plaintiff's work was done under special circumstances—a failed attempt to return to work does not discredit Dr. Winke's conclusion that Plaintiff cannot work.

Defendant asserts that the ALJ's analysis was proper: he noted Dr. Winke's specialty in pain management, and the length of time for which she had been treating the Plaintiff. ECF No. 11 at 19; R. 19. Further, the record is replete with comments of positive progress. Dr. Winke commented that Plaintiff was "doing reasonably well" and on multiple occasions she walked with a normal gait. ECF No. 11 at 20. Finally, even if Plaintiff's work from October 4, 2011 to May 10, 2012 did not qualify as substantial gainful activity, it may show that she is able to work at the level of substantial gainful activity. 20 C.F.R. § 404.1571.

Defendant points to other conflicts in the record—that the ALJ did not directly address in his ruling—where Plaintiff reported functioning at a higher level than Dr. Winke thought she

---

[5] To be precise, the ALJ actually said,

> [T]he evidence does not tend to reflect that the claimant's work during the applicable period was not substantial, and the undersigned notes that work at a lesser level of responsibility, activity, or pay than done previously may still be "substantial." Moreover, the work was clearly performed at SGA level, in terms of her earnings. However, because the resolution of this issue will not alter the outcome of this decision, the undersigned will reserve the determination of whether the claimant's work . . . between October 2011 and May 2012 constituted substantial gainful activity.

R. 16-17. So while the ALJ's determination is undermined by his findings on SGA, they are not completely irreconcilable.

could. ECF No. 11 at 21. In September 2012, Dr. Winke claimed that pain would affect Plaintiff's concentration and memory, making her unable to focus and stay on task in a work setting (R. 438), but in March 2011, Plaintiff did not record any problems with her concentration, memory, completing tasks, or understanding instructions (R. 199). Plaintiff also wrote that she followed written instructions "very well" and that she could pay attention for a "long time." R. 199. Dr. Winke stated that Plaintiff could only occasionally lift up to five pounds (R. 439), but at the hearing in October 2012 Plaintiff said she thought she could lift between ten and twenty pounds. R. 46.

Even if Dr. Winke's opinion as a treating physician's opinion is not entitled to controlling weight, the ALJ must weigh the factors outlined in 20 C.F.R. § 404.1527(c)(1)-(6) and §416.927(c)(2)-(6).  *See Burch v. Apfel*, 9 Fed. App'x 255, 259 (4th Cir. 2001) (per curiam); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000) (joining other federal courts in requiring the ALJ to consider § 404.1527(c) factors when declining to give controlling weight to the treating physician's opinion, and noting that ALJ should consider factors on remand).

Of the five factors listed in 20 C.F.R. § 404.1527(c) and § 416.927(c) the only factor that can conceivably be used to assign Dr. Winke's opinion little weight is consistency with the record. However, it is not truly inconsistent for Dr. Winke to state that Plaintiff is making progress on spinal surgery, yet still disabled. All of her statements that indicate improvement are relative, and to take the descriptions of "doing reasonably well" as conflicting with a finding of disability is to take them out of context. Further, as Plaintiff points out, working under special circumstances, and then being told that such circumstances were unsustainable, does not conflict with Dr. Winke's claim that Plaintiff could not work.

Further, neither the ALJ, nor the Defendant, adequately address the third factor of

"supportability," or talk about the large amount of evidence presented in support of Dr. Winke's opinion. The ALJ's assignment of "little" weight to Dr. Winke's opinions, based on these supposed contradictions with the medical record, is a misapplication of 20 C.F.R. § 404.1527(c) and § 416.927(c).

### (b) Dr. Goss

The ALJ found it inconsistent that Dr. Goss placed significant restrictions on Plaintiff, when by February 2012 her physical examination was "generally normal." R. 20. Plaintiff argues that the ALJ impermissibly "considered his own interpretations of Dr. Goss' examination notes to be superior to the doctor's own contemporaneously-expressed findings concerning and assessments of Ms. Covil's work restrictions." ECF No. 9 at 20. She emphasizes that Dr. Goss' opinions are consistent throughout his assessment of her, repeatedly restricting her to light or sedentary work. ECF No. 9 at 20.

Defendant argues the ALJ gave proper weight to Dr. Goss, and considered the necessary factors. ECF No. 11 at 21. The ALJ noted the appointments Plaintiff had with Dr. Goss, and recognized the examining and treatment relationship between them. ECF No. 11 at 21; R. 19. The ALJ also recorded that Dr. Goss performed the lumbar laminectomy, decompression, and fusion surgery, showing his recognition of Dr. Goss's medical specialty. ECF No. 11 at 21; R. 19.

Defendant primarily argues that the ALJ reasonably gave little weight to Dr. Goss's opinions because they were inconsistent with other evidence on the record. ECF No. 11 at 22. The ALJ explained that the treatment notes showed Plaintiff's objective physical symptoms to be "relatively benign," that her condition improved after surgery, and that she was often in no acute distress—on September 14, 2010 (R. 296) October 28, 2010 (R. 293), and December 9, 2010 (R.

291). ECF No. 11 at 22. While not specifically addressed by the ALJ, Defendant points out that a month after the surgery, Dr. Goss described Plaintiff as "doing reasonably well," she was neurologically intact, and her incision from the surgery was benign. ECF No. 11 at 22; R. 285. A month after that, Plaintiff reported that she was "doing well" and "pleased with her progress." R. 284. In August 2011, Plaintiff's pain levels had "apparently decreased as her activity levels have been increasing and Dr. Winke has decreased her use of narcotics." R. 317. In February 2012, Plaintiff had a generally normal physical examination—she was in no apparent distress, "walked with a normal gait, displayed grossly normal tone, muscle strength, and sensation, and a full range of motion in her major muscle groups." ECF No. 11 at 23; R. 308. An x-ray of Plaintiff's lumbar spine also showed normal post-operative changes. R. 308.

Defendant also finds Dr. Goss's opinions to be undermined by notes from before Plaintiff's surgery, when Plaintiff was not in acute distress, was able to rise from a sitting to a standing position with minimal effort, walked with a slow but steady gait, maintained full range of motion in her legs, and had reasonable strength in all major muscle groups. ECF No. 11 at 22; R. 297. Plaintiff was able to walk with a steady, nonantalgic gait on September 14 and October 28, 2010. ECF No. 11 at 22; R 293, 296.

While Defendant makes a more compelling case than the ALJ enunciated, the ALJ has again failed to apply the appropriate analysis. Of the five factors to be weighed according to 20 C.F.R. § 404.1527(c) and § 416.927(c), three factors clearly support Dr. Goss, one is not addressed, and the ALJ used only one to undermine Dr. Goss. The examining relationship, the nature of the treating relationship, and the specialization of the physician, all cut in favor of giving great weight to Dr. Goss. No mention in the ALJ's opinion is given to the degree of supporting explanations for Dr. Goss's opinions. Beyond this, the supposed inconsistencies

between Dr. Goss's evaluations and Dr. Goss's treatment notes are relatively innocuous. A statement from Plaintiff that she was "pleased with her progress" does not contradict a specific finding of disability. Isolated instances on which Plaintiff was able to walk with a regular gait, or appear without acute pain are not inconsistent with an overall finding of disability. In order to give such little weight to a treating physician, the ALJ must provide actual inconsistencies between Dr. Goss's opinion and the medical evidence. He must also address the degree to which the record does in fact support Dr. Goss's opinion, and give a sufficiently specific explanation for such support as 20 C.F.R. § 404.1527(c)(3) and § 416.927(c)(3) state.

### (c) Overview

In summary, an ALJ must afford controlling weight to an opinion unless it is not supported by clinical evidence or if it is inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590. Then, the ALJ must still afford some degree of weight to those opinions, based on the five-factors of 20 C.F.R. § 404.1527(c)(1)-(5) and § 416.927(c)(1)-(5): (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency with the record; and (5) the specialization of the physician.

In the present case, the ALJ did not afford controlling weight to the two treating physicians. He did this based on supposed inconsistencies with the medical record. R. 20. Then, in determining how much weight to give them, he used those same inconsistencies with the medical record to afford them little weight—first by giving Dr. Winke's opinions little weight for being inconsistent with Dr. Goss's notes, then by finding Dr. Goss's opinions inconsistent with his own notes. R. 20. The supposed inconsistencies are not, however, substantial. The ALJ has failed to identify with specificity the substantial medical evidence—anything more than a scintilla—that conflicts with the treating physicians' opinions. As argued by Plaintiff, the simple

fact that she was not always in acute pain, could sometimes walk with a regular gait, and occasionally said she was "doing well," do not constitute substantial evidence to deny controlling weight, much less afford little weight to Dr. Winke and Dr. Goss.

Further, even if there are inconsistencies that preclude affording controlling weight to their opinions, the ALJ did not adequately analyze the five factors under of 20 C.F.R. § 404.1527(c)(1)-(6) and § 416.927(c)(1)-(6). While Defendant has pointed to places where ALJ addressed some of the issues, the ALJ did not adequately address the supportability of their opinions under 20 C.F.R. § 404.1527(c)(3) and § 416.927(c)(3) .

Upon review, the Court finds that the ALJ made an error of law by not properly weighing the factors outlined in 20 C.F.R. § 404.1527(c)(1)-(6) and §416.927(c)(1)-(6) prior to assigning Dr. Winke and Dr. Goss's opinions minimal weight. For this reason, the case should be remanded. *Perales*, 402 U.S. at 390; *Coffman*, 829 F.2d at 517.

### 2. Duty of ALJ to Develop the Record

While the burden is on the Plaintiff to prove disability, in order to conduct his analysis appropriately, the ALJ has a duty to develop the record.  *Mink v. Apfel*, 215 F.3d 1320 (4th Cir. 2000) ("An ALJ has a duty to fully and fairly develop the administrative record."); *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) ("This circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate."); 20 C.F.R. § 404.1545 ("In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (*See* § 404.1512(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history.").

The Court must balance these competing duties, and neighboring district courts have interpreted Fourth Circuit precedent on the issue to mean that if the record was not fully developed, "a remand is proper where the Commissioner's decision 'might reasonably have been different had that evidence been before (her) when (her) decision was rendered.'" *Kearney v. Astrue*, 730 F. Supp. 2d 482, 484 (E.D.N.C. 2010) (citing *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980)).

Here, it appears that important information was not before the ALJ. Plaintiff's last recorded visit to Dr. Goss was on February 3, 2012. R. 307. Dr. Goss's notes record that he intended to order a CT Scan and FCE tests and he said that he would then assign permanent restrictions, if appropriate. R. 309. There is no final evaluation, CT or FCE results from Dr. Goss before this court.[6] Further, Dr. Winke recorded on March 26, 2012 that she could not complete the FCE due to BP issues. R. 387. If any such records exist, it is the duty of the ALJ to request them.

It is also appropriate for the ALJ to request an update from an agency physician, probing into an analysis of Plaintiff's actual present condition, rather than simply relying on past forecasts of what Plaintiff's recovery might be now.

### 3. Classification of Proper Exertional Level

Lastly, the ALJ's opinion is not sufficiently precise regarding Plaintiff's prior work history. This Court cannot make an appropriate determination as to whether the ALJ's opinion is supported by substantial evidence unless the ALJ clearly conveys the facts underlying his opinion.

---

[6] A CT Scan was ordered by Dr. Goss (R. 386-87), but is not apparent in the records. Nevertheless, a CT scan appears to have been done on February 22, 2012, when Plaintiff went to the Emergency Department of Chesapeake General Hospital. R. 331-32.

Plaintiff argues that the VE improperly classified her past work, at an exertional level inconsistent with the Dictionary of Occupational Titles (DOT). ECF No. 9 at 23. Plaintiff's past work includes janitorial work, and three distinct jobs, done part time in addition to her regular full time work. R. 188-90. The Vocational Specialist classified these jobs as "cleaning," "janitorial work park time" and "cleaner." R. 82. Janitor is classified as Medium, and commercial cleaner is classified as heavy. ECF No. 9 at 25; Code 382.664-010; 381.687-014.

Defendant argues that Plaintiff's past work most closely resembles that of housekeeper, DOT Code No. 323.687-014.

The VE testified at the hearing that Plaintiff's past relevant work as a street and highway cleaner was medium, but the other past work as a cleaner was light work. R. 60.

Because Plaintiff was engaged in various cleaning jobs, and there are different exertional levels attached to different cleaning jobs, the VE's testimony was not adequately specific. In order to determine whether the ALJ's opinion was supported by substantial evidence, the basis for that opinion must be clear; the court will not guess as to which "cleaning" job description the VE used. This case should therefore be remanded for a more thorough finding as to whether Plaintiff's prior cleaning was light or medium work.

## V.  <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be GRANTED, Defendant's Motion for Summary Judgment (ECF No. 10) be DENIED, the decision of the Commissioner be VACATED and the case be REMANDED for further administrative proceedings.

## VI.  <u>REVIEW PROCEDURE</u>

By copy of this Report and Recommendation, the parties are notified that pursuant to 28

U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

/s/
_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
January 14, 2015